AO 106 (Rev. 04/10) Application for a Search Warrant

US DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

# UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas

NOV 2 7 2023

Ronald E. Dowling

By_____
Deputy Clerk

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Apple iPhone with telephone number (479) 466-4001

)
)
)
)
)
)

Case No.    23-cm-55

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____Western_____ District of _____Arkansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. 1343 | Wire Fraud | |

The application is based on these facts:
See Attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DSS Special Agent Jonathan Berryhill
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 27, 2023 @ 1:45pm

City and state: Fayetteville, AR

_____
*Judge's signature*

U.S. Magistrate Judge Christy D. Comstock
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jonathan D. Berryhill, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Diplomatic Security Service, United States Department of State ("DSS") and have been sworn in this capacity since February 2010 after completing my training.   In this role, I primarily investigate violations of federal statutes concerning visa and passport fraud.   I am presently assigned to DSS's Criminal Fraud Investigations (CFI) Branch as a criminal investigator. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.   I have received specialized training in law enforcement and criminal law from both the Federal Law Enforcement Training Center in Glynco, Georgia and DSS's Interim Training Facility in Summit Point, West Virginia. I have conducted and participated in numerous investigations into various types of criminal violations, including travel document and immigration frauds, alien harboring, financial frauds, identity thefts, and human trafficking offenses. Many of the cases I investigate are complex, international schemes. During these investigations and others, I have analyzed phone and internet records and participated in the search and seizure of electronic devices.

2.      I make this affidavit in support of an application for search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search for and seizure of:

- An Apple iPhone with telephone number (479) 466-4001, further described in Attachment A-1.

- The person of Jason Boyd Carney, to locate an Apple iPhone with telephone number (479) 466-4001, further described in Attachment A-2.

1

3.      The purpose is for the seizure of items constituting evidence of the commission of criminal offenses, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, as more fully described in Attachments B-1 and B-2, respectively.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §1343 (Wire Fraud), and other violations have been committed by Jason Carney and evidence of such crimes will be found in the locations described in Attachments A-1 and A-2.

**FORENSIC ANALYSIS**

6.      Based on my knowledge, training, and experience, I know electronic devices can store information for long periods of time. Similarly, material sent by text, chat or e-mail are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

7.      As further described in Attachments B-1 and B-2, respectively, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence may be on the Device because:

            a.  Data on the storage medium can provide evidence of a file that was once on the
                storage medium but has since been deleted or edited, or of a deleted portion of a

2

file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## BACKGROUND ON 501(c)(3) ORGANIZATIONS

**8.** Organizations that are tax exempt under Section 501(c)(3) of the Internal Revenue Code are required to make annual public filings, signed under penalty of perjury, that disclose financial information to include their expenses and income. Relatedly, tax-exempt organizations must disclose to the IRS, and the public, the compensation of officers, directors, trustees, key employees, and highest compensated employees. Section 501(c)(3) organizations are required to

3

report this information on IRS Forms 990, specifically in three parts. Part VII "Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors," Part IX "Statement of Functional Expenses," lines 5, 7, 8 and 9, and Schedule J ("Compensation Information").

9.      Accurate disclosure of compensation to the IRS and the public is required on the Form 990 for several reasons, to include allowing the public and IRS to monitor and assess the reasonableness of employee compensation and for transparent accounting of the use of donor-derived funds.

10.     Section 501(c)(3) prohibits benefit of the net income of a tax-exempt organization to any private shareholder or individual having a personal and private interest in the activities of the organization.

11.     To ensure Section 501(c)(3) organizations fully and accurately report all compensation of officers, directors, trustees, key employees and highest compensated employees, such organizations are required to report "excess benefit transactions" on Forms 990, Schedule L. The following definitions, set forth in the Internal Revenue Code, applied to this requirement:

      a.  The term "excess benefit transaction" meant any transaction in which an economic benefit was provided by the tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeded the value of the consideration (including the performance of services) received for providing such benefit. An economic benefit was not to be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.

     **b.** Any person in a position to exercise substantial influence over the affairs of the tax-exempt organization at any time during the five-year period ("lookback period") prior to the date of such transaction was a "disqualified person."

     **c.** The term "disqualified person" also includes family members such as spouses, children, and siblings by whole or half-blood of disqualified persons.

     **12.** From tax year 2008 onward, Section 501(c)(3) organizations were required to disclose the existence of excess benefit transactions in Part IV, Checklist of Required Schedules, of IRS Form 990, by responding "yes" or "no" to questions 25(a) and 25(b) – disclosing whether the entity had such transactions in the current period or had discovered past such transactions. If the organization answered either question in the affirmative, it was required to describe the excess benefit transaction(s) in Schedule L Part I of the Form 990.

## BACKGROUND ON 2ND MILK, INC.

     **13.** According to its website, www.2ndMilk.org, 2nd Milk, Inc. (hereinafter "2nd Milk") was founded in late 2015 to provide baby formula, sharing of the gospel, nutritional and academic education, and to build chicken coops and pig farms for protein consumption for the malnourished child population in Malawi.[1] Per its website: "the 2nd Milk program is centered around sharing the gospel of Jesus Christ, discipling those that know Jesus and preparing this next generation to lead their communities to Spiritual Freedom."

     **14.** Though 2nd Milk's United States headquarters is the Carneys' home in Arkansas, according to its website, its overseas headquarters is in Lilongwe, Malawi, where 2nd Milk states

---

[1] 2nd Milk's website includes graphics implying that 2nd Milk operates in Malawi, Kenya, Uganda, and Ghana. However, through analysis of 2nd Milk's social media and finances, and through witness interviews, it appears 2nd Milk currently operates only in Malawi.

it "has a team of nutritionists that continually teach the local communities about proper education for their children living in the villages."

15.     According to its website and records obtained by Court order from the Internal Revenue Service,[2] Jason Carney is the president of 2nd Milk and his spouse, Lacey Carney, is the Chief Financial Officer, or CFO. 2nd Milk's Board of Directors includes C.P. (Vice President; Operations), D.H. (Vice President; Technology), and L.H. (Vice President; Development). According to its website, 2nd Milk also employs a Director, Nutritionist, Finance Officer, and Nutrition Assistant.

16.     2nd Milk derives funds for its purported mission through donations and sponsorships, both of which can be performed on the 2nd Milk website. The sponsorship option allows for individuals to provide "the most tangible and practical way you can save a baby's life…which provides the formula and nutritional needs for the baby of your choosing." To sponsor a baby, the potential sponsor is asked to provide $40 United States Dollars (USD) monthly for each baby – each baby can have up to two sponsors.

17.     The 2nd Milk website has a list of all available babies available to sponsor, and each baby listed has a basic biography detailing their current weight, a picture, and the reason why the baby is available for sponsorship. For example, according to the 2nd Milk website, the reason one baby is available for sponsorship is because "her mother died two months after giving birth due to a seizure. Her father is alive but doesn't provide any support. She is being cared for by her grandma who has a small business and takes care of 5 other orphan kids. She can't afford to buy formula for the baby."

---

[2] 2nd Milk's filed IRS Form 990s for the years 2016-2020 are publicly available here: https://www.irs.gov/charities-non-profits/search-for-tax-exempt-organizations

18.     The primary method of soliciting donations is directly through their website, peer-to-peer fundraising, donor advised funds, and directly engaging businesses and individuals for cash and in-kind donations.   In-kind donations are non-monetary donations made to nonprofit organizations.

19.     According to 2nd Milk's website, "*100% of the 2nd Milk sponsorships go directly to saving the lives of the most vulnerable babies living in developing countries.*"  In addition to child sponsorships, 2nd Milk solicits general donations, stating on their website "There are many expenses and financial needs involved in running a nonprofit. You can help with those costs directly by donating to those general financial needs."  Potential donors are encouraged to either make a one-time donation or a recurring monthly donation.  Lastly, 2nd Milk accepts "other donations" asking potential donors "If you are interested in donating goods, services or non-cash items such as stocks or securities, please contact us and someone will be in touch shortly to help facilitate your gift" [sic].

20.     In addition, Jason Carney directly solicits donations from individuals and businesses, purportedly on behalf of 2nd Milk.  For example, in April 2022, Jason Carney sent the following request seeking funds to a northwest Arkansas business, representing that, at that time, 2nd Milk was feeding more than 1000 orphans each day:

**2nd Milk Today**
We started in 2015 in Malawi Africa. Over the past 7 years we have given almost 3 million bottles of formula to orphaned infants, feed over 1000 orphans each day, church planting and discipleship programs working daily, built 2 chicken houses, 1 piggery, an agriculture training program and just started digging wells to provide clean drinking water for the local communities.

**Ministry Request**

**Our Needs -** Consider the following projects:
**Project 1: $60,000** for a container of formula, including transport to Malawi from South Africa.

**Project 2: $50,000** to drill 25 wells in Malawi Africa.

21.     2nd Milk also leads occasional "Mission Trips" to Malawi, during which donors and sponsors can visit 2nd Milk "feeding sites" i.e., the locations at which formula is purportedly distributed.

22.     2nd Milk is recognized by the IRS as a non-profit public charity under Section 501(c)(3) of the Internal Revenue Code. 2nd Milk applied for and was granted exemption from federal income tax by IRS Letter 5436, dated November 10, 2016.

23.     Sourced from both publicly available data and information obtained during the investigation, Table 1, below, shows a summary of 2nd Milk's reported compensation to its officers, directors, trustees, and key employees from tax years 2016 to 2021. In sum, 2nd Milk's public filings portray that the only key employee receiving compensation is Jason Carney in the indicated amounts.

| Table 1 | | | | | | |
|---|---|---|---|---|---|---|
| 2nd Milk Form 990 – Reportable Income | Tax Filing Year | | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Jason Carney (Board Chair & President) | $ - | $ - | $ - | $ - | $ 64,000.00 | $ 13,400.00 |
| Lacey Carney (Chief Financial Officer (CFO))) | $ - | $ - | $ - | $ - | $ - | $ - |
| C.P. (Board Member) | $ - | $ - | $ - | $ - | $ - | $ - |
| D.H. (Board Member) | $ - | $ - | $ - | $ - | $ - | $ - |
| L.H. (Board Member) | $ - | $ - | $ - | $ - | $ - | $ - |

24.    Table 2 summarizes 2nd Milk's reported average work hours per week by the Carneys and the other board members.

| Table 2 | | | | | | |
|---|---|---|---|---|---|---|
| 2nd Milk Form 990 – Average Hours Per Week | Tax Filing Year | | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Jason Carney (Board Chair & President) | 10 | 0 | 0 | 0 | 40 | 20 |
| Lacey Carney (CFO) - Officer | 5 | 0 | 0 | 0 | 1 | 1 |
| C.P. (Board Member) | 1 | 0 | 0 | 0 | 1 | 1 |
| D.H. (Board Member) | 1 | 0 | 0 | 0 | 1 | 1 |
| L.H. (Board Member) | 1 | 0 | 0 | 0 | 1 | 1 |

25.    During the tax years 2016-2021, 2nd Milk reported receiving significant sponsorship and donations funds, as summarized in Table 3 below:

| Table 3 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2nd Milk Form 990 –** | **Tax Filing Year** | | | | | | |
| **Schedule A** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **TOTAL** |
| **Gifts, grants, contributions, and membership fees received** | 240,209 | 485,714 | 239,465 | 419,076 | 342,463 | 644,387 | 2,371,314 |
| **Expenses** | (236,677) | (455,969) | (276,163) | (419,238) | (341,394) | (626,699) | (2,356,140) |
| **Compensation of current officers, directors, trustees, and key employees** | - | - | - | - | 64,000 | 13,400 | 77,400 |
| **Office Supplies/Expenses** | 2,197 | 2,814 | 2,898 | 8,493 | 6,916 | 15,588 | 38,906 |
| **IT** | 530 | 4,450 | 2,046 | 2,487 | 2,539 | 2,960 | 15,012 |
| **Occupancy** | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| **Travel** | 35,143 | 7,621 | 7,888 | 23,021 | 18,747 | 42,253 | 134,673 |
| **Formula & Supplies** | 184,608 | 380,402 | 244,435 | 342,425 | 243,031 | 546,396 | 1,941,297 |
| **Labor** | 4,549 | 48,000 | 6,689 | 36,219 | - | - | 95,457 |
| **Bank Charges** | 3,650 | 6,682 | 6,207 | 593 | 161 | 102 | 17,395 |
| **Revenue less expenses** | 3,532 | 29,745 | (36,698) | (162) | 1,069 | 17,688 | 15,174 |

26.    Of note, 2nd Milk reports that:

   o   $1,941,297 of the $2,371,314 it has received in grants and contributions is spent on "Formula and Supplies;"

   o   In 2020 and 2021, 2nd Milk had no labor costs beyond the compensation set out in Table 1;

   o   The charity's "occupancy" expenses are an even $6,000 annually.

27.    For the tax years 2016-2021, 2nd Milk did not report or disclose the existence of *any* excess benefit transactions on its IRS Forms 990. In fact, when asked "Did the organization engage in an excess benefit transaction with a disqualified person during the year?," in tax years 2016-2021, 2nd Milk filed Form 990s indicated "no." In sum, 2nd Milk certified that no disqualified

person (which would include its President, and CFO, Jason and Lacey Carney, respectively) received any unreported economic benefit from 2nd Milk.

**28.**     In addition, 2nd Milk's publicly filed Forms 990 make the following notable assertions:

- o   2nd Milk does not maintain an office, employees, or agents outside of the United States.

- o   2nd Milk did not have aggregate revenues or expenses of more than $10,000.00 from program service activities outside the United States, nor aggregate foreign investments valued at $100,000 or more.

- o   The name and address of the person possessing the organization's books and records is Jason Carney at his Springdale, Arkansas home.

- o   2nd Milk has a written conflict of interest policy.

- o   2nd Milk requires employees to annually disclose any interests that could give rise to conflicts.

**29.**     2nd Milk maintains its own operating checking and credit accounts, in 2nd Milk's name, including accounts at Bank of the Ozarks (now closed) and Arvest Bank, and various credit accounts at American Express.

## 2nd MILK'S SOLICITATION OF DONATIONS AND OPERATIONS

**30.**     According to various 2nd Milk marketing and donation materials, 2nd Milk claims that "[o]ver the past 7 years we have given almost 3 million bottles of formula to orphaned infants [and] feed over 1000 orphans each day[.]" According to interviews of witnesses, including former 2nd Milk employees and families who have travelled to perform mission work in Malawi with 2nd Milk, those figures are grossly exaggerated, with estimates that it feeds 70 children daily.

**31.**     In a late 2022 interview, Witness-1, a former Director of 2nd Milk's Malawi operations stated to investigators at the U.S. Embassy in Lilongwe, Malawi that he was tasked with managing 2nd Milk's Malawi project budget, which was only approximately $6,000 a year.

11

Witness-1 said he had been requested by Jason Carney to mobilize babies to come to the feeding centers to give the impression that 2nd Milk was feeding large numbers of children, which would then sustain a growth in funding for 2nd Milk's mission. Witness-1 indicated that despite 2nd Milk's claims of feeding 1000 children a day, the working figure during his employment was about 69 babies.

32.     Agents conducted interviews of other witnesses to 2nd Milk operations in November of 2022, as well as March and October of 2023. Witness-2 recalled a 2016 conversation with a 2nd Milk staff member in Malawi. The staff member indicated that 2nd Milk is only giving the children one bottle a day, the staff were barely paid, and that 2nd Milk was feeding fewer than 30 children. Witness-1 recalls seeing only a case or two of formula in the 2nd Milk location and remembers being surprised by that, considering sponsor fees for 2nd Milk children were 200 dollars per month at the time. In 2018, Witness-2 spoke with 2nd Milk staff in Malawi, asking for an update on the child that Witness-2 had been sponsoring. Witness-2 learned that the sponsored child moved to another location and had not been part of the 2nd Milk program since sometime in early 2017, though Witness-2 had never been notified of such.

33.     Witness-3, a former employee for 2nd Milk, stated that during his/her employment at 2nd Milk, Jason Carney categorized all expenses on taxes as baby formula (presumably to make it appear that 2nd Milk was purchasing more formula than in reality), although 2nd Milk never had more than 50-60 babies. Witness-3 told investigators that he/she was mistakenly allowed access to 2nd Milk financial statements and noted that Jason Carney could not account for money expenditures when confronted. Witness-3 indicated he/she believed the amount of money that 2nd Milk claims to spend on formula is untrue.

34.     Witness-4 travelled to Malawi with 2nd Milk on two occasions, in 2018 and again in 2019. Witness-4 indicated that for the 2018 trip, Witness-4 raised money to bring for formula

and supplies, which Jason Carney indicated should be given to him directly in the form of cash. Witness-4 did not receive any receipt or acknowledgment for the cash donations. Witness-4 indicated that prior to travelling to Malawi, he/she was led to believe by Jason Carney that 2nd Milk had developed certain infrastructure in Malawi to supports its mission (items including schools and chicken coops), but that after arriving in Malawi, he/she realized that 2nd Milk's representations had been misleading, at best.

35.     Witness-4 indicated that, during the mission trip, to obtain formula to feed infants at the feeding sites, he/she, Jason Carney, and other volunteers, stopped at a local grocery store and bought the available formula. He/she never witnessed other amounts of stored formula at the feeding sites or elsewhere that would support a large-scale distribution operation. Witness-4 indicated that after speaking with 2nd Milk employees in Malawi at various feeding sites, the employees indicated that 2nd Milk had not been present at that feeding site "for months."

36.     Witness-5 traveled with 2nd Milk on a mission trip in 2019 and remarked that prior to the trip, he/she was led to believe that 2nd Milk had a robust formula program, chicken houses, and program for sending graduates of the 2nd Milk formula program to school. Upon arriving to Malawi, Witness-5 did not see any of these operational projects. Witness-5 said that after returning from the mission trip, he/she was contacted by a 2nd Milk employee, who stated that he/she was not being paid for his work and needed financial assistance.

37.     Witness-5 indicated that he/she operated a business that made frequent and regular donations to 2nd Milk. Witness-5 indicated that at some point, Jason Carney asked him/her to begin sending donated funds directly to Carney's personal bank account instead of 2nd Milk's accounts, which Witness-5 refused to do.

**38.** A.W., a nursing student who spent approximately two weeks at 2nd Milk sites in Malawi in 2021, indicated in a publicly available report[3] on her trip that part of her daily work with 2nd Milk included the *daily* travel to and purchase of formula from a grocery store to bring to feeding sites, which is inconsistent with an operation conducting the sustained feeding of 1000 children each day.

**39.** Investigators obtained documents from the Non-Governmental Organizations Regulatory Authority ("NGORA"), a Malawian entity mandated to register and regulate NGO operations in Malawi, regarding 2nd Milk's audit of its finances. In one document entitled "Financial Statements For the year ended 30 June 2021," 2nd Milk indicated that "Our staff procures local supplies each week and visits our established feeding centres where we hand deliver and help feed over 150 babies between Lilongwe and Ntcheu operation centres. We start with prayer and sermon, then move into our baby feeding operation, mixing bottles of lactogen on-sit [sic] as needed and handing caregivers tins of formula, packages of liken Phala [a nutritional supplement] and vitamins." 2nd Milk's financial statements detail income of 43,126,600 kwacha (approximately $42,000, at the exchange rate detailed in the audit documents) and program costs of 44,535,652 kwacha (approximately $43,500). The financial documents underlying the audit captures total 2nd Milk assets of approximately $10,500. Comparatively, 2nd Milk's 2021 Form 990s detail donations, gifts, grants, and contributions totaling $644,387 and formula and supply expenses of $546,396.

## PROBABLE CAUSE

**40.** Despite 2nd Milk's assertions in its tax filings, advertising materials, and representations to donors, I have probable cause to believe that Jason Carney is co-mingling 2nd Milk's funds with the Carneys' personal funds and using 2nd Milk money for personal expenditures

---

[3] https://scholarworks.uark.edu/cgi/viewcontent.cgi?article=1171&context=nursuht

that would constitute unreported excess benefits. Moreover, I have probable cause to believe that Jason Carney is soliciting donations, representing the funds will be used to support 2nd Milk and its mission, including aiding starving children in Malawi, when in fact he intends to divert the money to his personal use. I have cause to believe that Jason Carney's scheme to defraud donors, sponsors, and the charity itself, entails the use of various sound and signals transmitted in interstate commerce, thus Carney's conduct appears to meet the statutory definition of wire fraud.

41.     The investigation has demonstrated that monies from 2nd Milk, are being used for obviously non-charitable purposes including but not limited to funding the Carneys' lifestyle, including frequent international and domestic travel (including, but not limited to, airfare, lodging, dining, and tours) unrelated to 2nd Milk, paying for the Carneys' vehicles and watercraft, and making mortgage payments on the Carneys' personal residence. Jason Carney's/2nd Milk's representations to potential donors, including its publicly filed Forms 990, induce donations and sponsorships with the promise that those funds will be used to support 2nd Milk's stated mission. Instead, *significant* portions, totaling hundreds of thousands of dollars, of donated funds are being routed to the Carneys' personal banking and credit accounts for personal use, including, but not limited to, as follows:

### *Transfers from 2nd Milk Accounts to Jason Carney's Credit Accounts*

42.     From 2015 through 2019,[4] 2nd Milk's Bank of the Ozarks commercial account (with account holders Jason and Lacey Carney) ending in *****0670 made at least $271,988.01 in payments/transfer to Chase Bank personal credit accounts in Jason Carney's name, including to three Marriott Rewards Premier Credit Cards (ending in 8207, 2494, and 8957) all issued to

---

[4] Bank of the Ozarks terminated its relationship with the Carneys in August 2019.

cardholder Jason Carney. Analysis of these accounts indicates they are used almost exclusively for personal expenditures and not 2nd Milk related transactions[5].

**43.**     Jason Carney also directed 2nd Milk funds to pay his personal American Express Credit accounts. As an example, between December 2, 2022 and June 14, 2023, *a period of approximately six months*, Jason Carney made *$171,883.91* in payments from 2nd Milk's Arvest accounts to his American Express credit accounts (ending in 1004 and 2002 jointly controlled by Jason and Lacey Carney). Payments ranged in size from $1,000 to approximately $15,000, with multiple payments often occurring in a single week. Analysis of use activity on these credit accounts shows they are for personal expenditures, including personal travel and domestic expenses including utility payments, and not legitimate 2nd Milk activity. For example, a snapshot of activity includes:

| Sample Expenses | | |
|---|---|---|
| **DATE** | **AMOUNT** | **PURPOSE** |
| February        21, 2023 | $954.00 | Helicopter tour, Las Vegas, Nevada |
| April 17, 2023 | $10,419.50 | Sable Creek, safari lodge in South Africa |
| April 25, 2023 | $1,251.74 | Pro Tire & Automotive Center, Springdale, Arkansas |
| April 26, 2023 | $820.13 | Roundtrip airfare to Cancun, Mexico for Lacey Carney |
| May 1, 2023 | $989.14 | State Farm Insurance |
| May 2, 2023 | $1,047.58 | Roundtrip airfare to Dallas, Texas for Jason Carney █ |
| May 12, 2023 | $514.06 | Ozarks Electric Cooperative |

---

[5] It is possible that these personal cards *may* have been used for infrequent 2nd Milk related travel. Though, absent more information, it's unclear. For example, the Carneys' personal cards were used to book travel to and from Africa on occasion. Though evidence, including Jason Carney's social media pages, shows that Jason Carney often travels to Africa for personal reasons such as big game hunting. Proper financial management would dictate that 2nd Milk's operating accounts fund its employees' business-related travel.

*Transfers from 2nd Milk to Jason Carney's Bank Accounts*

**44.**     Jason Carney also moved 2nd Milk funds directly to his personal bank accounts. For example, between February 29, 2016, and August 01, 2019, from the same 2nd Milk commercial account ending in 0670, Jason Carney transferred at least $191,757.00 to his and Lacey Carney's Bank of the Ozarks joint checking account number *****0811. During this same period, that same 2nd Milk account ending in 0670 sent at least $28,000.00 in transfers to Jason and Lacey Carney's Bank of the Ozarks joint checking account number ******0092. Analysis of the Carneys' accounts confirms they too are for personal expenditures and not legitimate charity-related transactions.

**45.**     Analysis of 2nd Milk Inc.'s Arvest Bank checking account numbers ****1514 and ****8395, revealed a pattern of transfers of funds in even dollar amounts from and deposits of the same amounts, into Jason and Lacey Carney's Arvest Bank checking account number ****4125. This occurred at least 81 times between September 2019 through November 2022, totaling $183,930.00. At least 39 times out of these 81 transfers and deposits, the Carneys subsequently made almost immediate payment to New American Funding ("NAF"), the mortgage lender for the Carneys' residence.

**46.**     On some occasions, the use of 2nd Milk funds to pay the Carney's mortgage were less subtle. For example, in February 2020, the Carneys paid their mortgage to NAF, $4,722.52, *directly* from 2nd Milk's Arvest Bank commercial account ****0304.[6]

**47.**     Similarly, following deposits of 2nd Milk funds directly into the Carneys' personal accounts, the Carneys would make immediate payments to loan notes for personal vehicles and

---

[6] While there are tax consequences associated with the exclusive and regular use of a portion of a private residence for business purposes, and though 2nd Milk maintains that the Target Residence is the headquarters of 2nd Milk's operations, neither 2nd Milk's public 990 filings nor the Carneys' personal tax disclosures indicate any such arrangement. In fact, 2nd Milk's 990s indicate an annual $6,000 occupancy expense, far less than the approximately $100,000 of 2nd Milk money funneled into the Carneys' home between 2017 and 2022.

17

watercraft.  For example, On March 13, 2023, the Carneys' Arvest Bank account ending in 4125 received a $3,000 transfer from 2nd Milk's Arvest account ending in 8395.  The following day, the Carneys made a $795 payment to loan provider Ally towards a 2020 Toyota Tundra.  Again on March 22, 2023, the Carneys' Arvest Bank account ending in 4125 received $4,000 from 2nd Milk's Arvest account ending in 8395.  That same day, the Carneys' paid $890 towards a 2015 Jeep Wrangler, $840 towards a 2022 Toyota 4Runner, $614 towards the note for a personal watercraft and trailer, and $1,000 towards a home equity line of credit.

### Deposit of 2nd Milk Donations Into Personal Accounts

**48.**     On some occasions, checks intended as donations for 2nd Milk were deposited directly into the Carneys' personal accounts.  For example, on or around June 4, 2018, the following check bearing the memo line "2nd Milk – God Bless" was deposited into the Carneys' personal Bank of the Ozarks account ending in 0811:



**49.**     On or around October 29, 2018, the following check intended for 2nd Milk was deposited into the Carneys' personal Bank of the Ozarks account ending in 0811.



In May 2019 the following check with the memo line "2nd Milk" was deposited into the Carneys' personal Bank of the Ozarks account ending in 0811. Account data reveals no corresponding movement of money to any 2nd Milk account, but instead continued personal expenditures.



50.    On or around August 23, 2019, the following check with the memo line "2nd Milk" was deposited into the Carneys' personal Arvest Bank account ending in 4125:



Account data reveals no corresponding movement of money to any 2nd Milk account, but instead continued personal expenditures.

### *Misuse of 2nd Milk Accounts/Cards for Personal or Non-Charity Related Expenses*

**51.**     Analysis of 2nd Milk operating accounts show that the funds are frequently used for non-charitable purposes and for the Carneys' personal use.  For example, at least $221,287.55 from 2nd Milk Inc.'s Bank of the Ozarks account ending in 0670 in payments/transfers, ranging from $100.00 to $38,000.00, to American Express accounts, including cards issued in 2nd Milk's name to Jason and Lacey Carney, including Business Gold Rewards Card accounts ending in 1004 and 1012.

**52.**     Though both cards are affiliated with 2nd Milk, they appear to have been used for what appear to be non-charity related purposes including $10,752.40 to Royal Caribbean, $16,687.71 at Walmart, $10,000 in fees as the result of returned check/declined bank transactions, $7,106.56 at Sam's Club, $3,773.66 in interest charges on promotional balances, $3,642.47 in late payment fees, $3,629.18 at Target, food establishments across the United States (including $1,158.13 at Slim Chickens, $990.24 at Chick-Fil-A, $723.23 at McDonald's, all   between November, 2015 and October 2016), purchases for fuel, $1,479.11 for movie tickets (locations include Cinemark Theatres, Razorback Cinema, AMC Theatres, Pinnacle Cinema, Springdale Cinema, Regal Cinemas, and more), car washes, and other larger transactions, including a transaction of $1,519.97 at Better Homes Supply in Fort Smith, AR; $2,827.00 at the dentistry office of Dr. JBJ, DDS; and $2,195.98 at Apple.

**53.**     The 2nd Milk account appears to be used directly for additional non-charity related expenses that are unreported as excessive benefits in its tax filings.  For example, between February 2022 and September 2022, 2nd Milk Inc.'s Arvest Bank checking account number

****8395 funded *$48,645.65* in payments to Sable Creek Safari Lodge, a luxury tented safari camp, in South Africa. Payment amounts ranged from $1,315.95 to $19,670.60.[7]

54.    Between February 2018 and April 2018, 2nd Milk made at least $3,513.00 in wire payments to Omulu Safaris originating from 2nd Milk Inc.'s Arvest Bank checking account number ****8395. Omulu Safaris is a family-owned private game lodge in South Africa.  On January 20, 2018 Jason Carney, B.B., M.H., L.H., and C.S., departed the United States for South Africa, purportedly for work with 2nd Milk, as documented on Jason Carney's Instagram (@jasoncarneyafrica) and confirmed through subpoena returns from Delta Airlines.



Omulu Safari club's Facebook page confirmed Jason Carney's visit on or about February 2, 2018.

---

[7] As noted in par. 43, Jason Carney's personal credit cards also made payment to Sable Creek Safari Lodge.



### *Large Cash Withdrawals*

55.     Jason Carney has made numerous large, currently unexplained, cash withdrawals from 2nd Milk's Bank of the Ozarks and Arvest operating accounts.  This includes:

| Date (On or around) | Account and Institution | Amount |
|---|---|---|
| June 15, 2016 | Bank of the Ozarks, 2nd Milk, Inc. | $12,000 |
| October 19, 2017 | Bank of the Ozarks, 2nd Milk, Inc. | $19,000 |
| January 18, 2018 | Bank of the Ozarks, 2nd Milk, Inc. | $15,000 |
| March 1, 2019 | Bank of the Ozarks, 2nd Milk, Inc. | $16,000[8] |
| May 31, 2019 | Bank of the Ozarks, 2nd Milk, Inc. | $5,000 |
| September 19, 2019 | Arvest Bank, 2nd Milk, Inc. | $2,000 |
| November 18, 2019 | Arvest Bank, 2nd Milk, Inc. | $1,020 |
| November 6, 2020 | Arvest Bank, 2nd Milk, Inc. | $1,600 |
| January 27, 2022 | Arvest Bank, 2nd Milk, Inc. | $9,000 |
| February 25, 2022 | Arvest Bank, 2nd Milk, Inc. | $4,000 |
| February 25, 2022 | Arvest Bank, 2nd Milk, Inc. | $8,000 |

[8] Shortly after this cash withdrawal, the Carneys purchased, using $15,000 cash, a 2010 Toyota FJ Cruiser.

| | | |
|---|---|---|
| April 15, 2022 | Arvest Bank, 2nd Milk, Inc. | $9,500 |
| November 21, 2022 | Arvest Bank, 2nd Milk, Inc. | $12,000 |
| February 20, 2023 | Arvest Bank, 2nd Milk, Inc. | $9,000 |
| February 21, 2023 | Arvest Bank, 2nd Milk, Inc. | $9,000 |
| March 6, 2023 | Arvest Bank, 2nd Milk, Inc. | $9,000 |
| March 9, 2023 | Arvest Bank, 2nd Milk, Inc. | $9,000 |
| March 10, 2023 | Arvest Bank, 2nd Milk, Inc. | $100,000 |
| April 10, 2023 | Arvest Bank, 2nd Milk, Inc. | $6,000 |
| June 6, 2023 | Arvest Bank, 2nd Milk, Inc. | $50,000 |
| **Note:** This table may consolidate multiple withdrawals made on the same day into a single entry. | | |

**56.** On one occasion, Jason Carney was encountered carrying large amounts of cash abroad. On March 21, 2023, agents with Customs and Border Patrol at the Atlanta International Airport conducted an outbound inspection of Jason Carney during travel to Africa. When confronted by agents, Carney acknowledged that he was travelling with $68,000 USD in cash that he initially failed to declare to customs agents.[9] Jason Carney indicated the cash was to be deposited into a bank account once he arrived in Malawi. When Customs and Border Patrol Agents asked Carney if he had ever travelled with cash more than $10,000 during the previous year, Carney answered "no."

---

[9] Federal law requires that anyone travelling internationally into or out of the United States must disclose the possession of currency/monetary instruments greater than $10,000. Unbeknownst to investigators, the encounter was filmed by National Geographic for the program "To Catch a Smuggler" available here: https://www.nationalgeographic.com/tv/shows/to-catch-a-smuggler/episode-guide/season-06/episode-04-money-dog/vdka34159094, beginning at approximately the 35:56 timestamp.

*The Carneys' Income*

57.    A review of the Carneys' personal income tax returns confirms that their reported income is unexplained and grossly incommensurate with their lifestyle and expenses, suggesting a substantial source of unreported income, likely money diverted from 2nd Milk.  Moreover, the Carneys' personal tax filings detail *no reported income* from 2nd Milk or his other purported businesses, as outlined below.  From tax years 2016 through 2020, the Carneys reported joint annual income as outlined below, notably declaring approximately $50,000 (at or only slightly above federal poverty guidelines when considering claimed dependents[10]) or less in tax years 2017 through 2020,[11] despite bearing expenses and engaging in a lifestyle commensurate with a much higher income level.



---

[10]https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines/prior-hhs-poverty-guidelines-federal-register-references/

[11] Recall, in par. 25, Table 1, that in 2020, 2nd Milk indicated it paid Carney $64,000 in compensation.



58.     As the chart details, beginning in 2019, Jason Carney's income source shifted from regular wage income (captured on IRS Forms W-2) to personal business income (often reported on IRS Form 1099).[12] The source of Jason Carney's reported non-wage income from 2017 through 2020 is listed in his filed IRS Form Schedule C only as "Consulting," however his returns for those years are accompanied by *no* Forms 1099 that could corroborate the source of his "consulting" income.   The source of Lacey Carney's reported business income from 2017 through 2020 is reported only as "sales," however the returns are accompanied by *no* Forms 1099 that could corroborate the source of her "sales" income.   Nor do the returns detail any wages or income from 2nd Milk or Jason Carney's other business entities, discussed below.

59.     Data collected from the IRS from reporting employers (i.e., those entities that reported paying the Carneys on either a 1099 or W-2) confirms that neither 2nd Milk nor Jason Carney's other business entities are a reporting source of the Carneys' income.   Analysis of the Carney's various bank accounts reveals no other regular and substantial source of legitimate business income.

60.     Two witnesses reported that in conversations with Jason Carney, he indicated that he draws, variously, either little or no income from 2nd Milk operations, and that his income is derived from other entrepreneurial enterprises.   However, this too is contradicted by his personal taxes and analysis of the Carneys' account data.

---

[12] Jason Carney's 2017 wages were from employer ▇▇▇▇▇ 2018 and 2019 wages are from ▇▇▇▇▇ both of which appear unrelated to his work at 2nd Milk, Inc.

61.     Carney is/was the registered agent for at least two additional business, but neither appears to generate regular income, if any, undercutting them as an alternate explanation for the Carneys' income.  Kruger Safari Club, LLC,[13] purports to lead trophy hunting expeditions in various African countries and claims that "a LARGE portion of the meat from our hunts is given directly to the local communities and villages."  According to the Arkansas Secretary of State's website, Carney is/was the incorporator/organizer, and Kruger Safari Club's principal address is the Carneys' home address.  As of the date of the submission of this application, the license status of Kruger Safari Club, LLC, is "not current."

62.     From September of 2019 through December of 2021 (at which time the account was "cashed out"), Kruger Safari's Arvest Bank account ****0524 had conducted fewer than 30 total financial transactions, the majority of which were the transfer of money to Jason Carney's personal accounts and payments to Jason Carney's American Express credit account, i.e., not for transactions normally associated with operation of an African hunting safari business.  During this three-year period, the account received only approximately $42,000 in deposits.  Moreover, the Carneys' joint income tax return records declares no income from Kruger Safari.

63.     Wanderlist Global, LLC,[14] is a purported travel agency, whose registered agent is Jason Carney, with a principal business address of the Carneys' home address.  According to the Arkansas Secretary of State, Jason Carney is also listed as the Incorporator/Organizer.  From about December 2020 through March 2023, Wanderlist Global's Arvest Bank account conducted fewer than 50 total financial transactions, the majority of which were the transfer of money to Jason Carney's personal accounts and payments to Jason Carney's American Express credit account, i.e., neither the quantity nor type of transactions normally associated with the operation of an

---

[13] https://www.krugersafariclub.com

[14] https://www.wanderlistglobal.com

international travel agency. During this period, the account received only approximately $100,000 in deposits (a single deposit constituting $55,400 of that total), the purpose of which is unknown to law enforcement at this time. Moreover, the Carneys' joint income tax returns from 2016 to 2020 declare no income from Wanderlist Global, LLC.

64.     In a January 2022 fundraising pitch on Facebook, Jason Carney asserted that *all* Wanderlist Global's profits were used to support 2nd Milk's purported mission. However, no transfers of money from Wanderlist Global to 2nd Milk have been identified.

65.     Discounting the Carneys' substantial personal leisure travel, a snapshot of expenses clarifies that their reported income is insufficient to support the Carneys' lifestyle. The Carneys' mortgage, vehicle payments (including at least three automobiles and a bass boat trailer), and insurance for those items alone exceeds $6,000 per month ($72,000 per year). Basic utility expenses and other loan obligations (including a home equity loan) account for an estimated additional $2,000 per month ($24,000 per year). Excluding *any discretionary spending*, it is estimated the Carneys spend well over $8,000 each month ($96,000 annually) (compare with reported income in Table 4), the majority of which appears to be funded by money diverted from 2nd Milk.

## OTHER MISREPRESENTATIONS REGARDING 2nd MILK

66.     Analysis of information obtained from online payment service Venmo suggests that Jason Carney is intentionally misrepresenting 2nd Milk's reported labor costs in 2nd Milk's public disclosures. Law enforcement has identified through payment records and social media accounts, E.B. as 2nd Milk's dietitian and director of operations. Beginning in August 2021 and continuing through at least March of 2023, Jason Carney sends E.B. a Venmo transfer every two weeks. Based on the regularity, amount, and memo line of the payment it appears to be E.B.'s 2nd Milk salary payment. Below are the dates of the transactions, amount, and memo line.

| Date | Amount | Transaction Memo |
|------|--------|------------------|
| 8/16/2021 | $2115 | 2Mмw |
| 9/1/2021 | $2115 | 2Mмw |
| 9/15/2021 | $2115 | мw 💚 |
| 10/5/2021 | $2292 | 2Mмw |
| 10/15/2021 | $2292 | 2Mмw 🖤 |
| 11/1/2021 | $2292 | 2Mмw 🖤 |
| 11/15/2021 | $2292 | 2M мw |
| 12/1/2021 | $2292 | 2Mмw |
| 12/17/2021 | $2292 | 2Mмw |
| 1/4/2022 | $2292 | 2Mмw |
| 1/17/2022 | $2292 | 2Mмw |
| 2/1/2022 | $2292 | 2nd Milkмw |
| 2/15/2022 | $2292 | 2Mмw |
| 3/2/2022 | $2292 | 2nd Milkмw |
| 3/16/2022 | $2292 | 2M мw |
| 4/1/2022 | $2292 | 2M мw |
| 4/16/2022 | $2292 | 2Mмw |
| 5/2/2022 | $2292 | 2Mмw |
| 5/17/2022 | $2292 | 2M 🖤 |
| 6/1/2022 | $2292 | 2Mмw |
| 6/17/2022 | $2292 | 2Mмw |
| 7/5/2022 | $2292 | 2Mмw |
| 7/15/2022 | $2292 | 2Mмw |
| 8/2/2022 | $2292 | 2Mмw |
| 8/17/2022 | $2292 | 2Mмw |
| 9/1/2022 | $2292 | 2Mмw |
| 9/15/2022 | $2292 | 2M мw 🖤 |
| 10/4/2022 | $2292 | 2Mмw |
| 10/17/2022 | $2292 | 2Mмw |
| 11/1/2022 | $2292 | 2Mмw |
| 11/13/2022 | $1000 | Bonus for being above average 😄 |
| 11/17/2022 | $2292 | 2Mмw |
| 12/4/2022 | $2292 | 2M мw |
| 12/20/2022 | $2292 | 2Mмw |
| 1/2/2023 | $2292 | 2Mмw |
| 1/17/2023 | $2292 | 2Mмw 🖤 |

| 2/3/2023 | $2292 | 2Mмw |
|---|---|---|
| 2/15/2023 | $2292 | 2Mмw |
| 3/6/2023 | $2292 | 2Mмw |

67.     In four months of 2021 alone, E.B. received $20,097 in apparent salary payments from 2nd Milk, despite no such declaration on 2nd Milk's Form 990 of payment to E.B. as a key employee.  2nd Milk otherwise declared no labor costs for 2021.  In 2022, E.B. received more than $55,000 from 2nd Milk.

### USE OF IPHONES

68.     Based on information obtained from service provider Verizon, the number (479) 466-4001 is registered to Jason Carney as recently as August 2023.  Additional law enforcement database searches associate the number (479) 466-4001 with Jason Carney.  Further, records obtained from Delta Airlines show that airline tickets purchased on November 3, 2023, by Jason Boyd Carney list his contact number as (479) 466-4001.

69.     In my training and experience, personal cell phones are typically kept on one's person as opposed to being left at one's home.  Probable cause exists to believe Jason Carney is no different in this regard.  Accordingly, this Affidavit therefore seeks warrants to search Jason Carney's person (and items on his person that may carry a cell phone) for his iPhone.

70.     In my training and experience, people use cellphones to create instant messages, emails, voicemails, photos, videos, and documents used in furtherance of not only legitimate business activity, but also criminal activity, including to communicate and facilitate the offenses under investigation.  In this case, I believe that Jason Carney uses his phone to conduct what appears to be legitimate charity-related business.

71.     I have probable cause to believe that Carney is using the phone with number (479) 466-4001 to make financial transactions relevant to the investigation.  For example, Jason Carney's Venmo account, used to facilitate the transactions described in paragraphs 66 & 67, is registered

to (479) 466-4001.  Moreover, from December 2, 2022, to April 3, 2023, Carney made 23 mobile

payments to the American Express accounts discussed above.  Information obtained from

American Express details the phone number associated with Jason Carney's accounts is (479) 466-

4001.

      **72.**    Apart from using the phone to make 2nd Milk related funds transfers as outlined

above, there is probable cause to believe that Jason Carney uses the phone to communicate with

employees, and potential donors and sponsors.  For example:

- On October 9, 2023, Jason Carney used phone number (479) 466-4001 to communicate with Witness-6 about 2nd Milk's annual fundraising event.

- On March 2, 2022, Jason Carney used phone number (479) 466-4001 to leave a voice message to Witness-7, a former 2nd Milk sponsor/contributor describing a conversation he had with a 2nd Milk employee.

- While discussing 2nd Milk's mission in January 2022 Facebook live event, Jason Carney indicated he should be contacted for follow up questions via text message or phone call.

- In September 2020, Carney spoke with Witness-8, using phone number (479) 466-4001, regarding 2nd Milk operations, funding sources, projects, and income.

- Jason Carney used WhatsApp, a communications application used almost exclusively through cellular phones, to discuss 2nd Milk related items.  This includes conversations in June of 2018 with Witness-2, and September and March of 2022 with Witness-7.  These conversations included details about 2nd Milk's operations in Malawi, including 2nd Milk employees, 2nd Milk's connections to Malawi government officials, safari trips while on 2nd Milk mission trips, and 2nd Milk's charitable donations and projects.

- In June of 2018 and March 2019, Jason Carney asked participants to an upcoming 2nd Milk mission trip to Malawi to download the WhatsApp application and to add Jason Carney as a contact at number (479) 466-4001

## **CONCLUSION**

73.     Based on the foregoing, I respectfully submit there is probable cause to believe that

in the locations described in Attachments A-1 and A-2, there exists, as further described in

Attachments B-1 and B-2, evidence of violations of federal law, including: 18 U.S.C. § 1343 (wire

fraud).

FURTHER SAYETH YOUR AFFIANT NAUGHT.

Jonathan D. Berryhill
Special Agent
Diplomatic Security Service

Subscribed and sworn before me
this 27 day of November 2023

Hon. Christy D. Comstock
United States Magistrate Judge

31

## ATTACHMENT A-1
## DESCRIPTION OF THE PROPERTY TO BE SEARCHED

An Apple iPhone with assigned telephone number (479) 466-4001.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described at Attachment B-1.

**ATTACHMENT A-2**
**DESCRIPTION OF THE PERSON TO BE SEARCHED**

The person of Jason Carney to include handbags, backpacks, briefcases, satchels, and any other accessory on his person that may be worn or carried that may contain his cell phone. Jason Carney (pictured below) is described as a 45-year-old white male, 5'10" tall, 185 pounds, with brown hair and brown eyes.



33

## **ATTACHMENT B-1**
## **PARTICULAR THINGS TO BE SEARCHED FOR AND SEIZED**

An Apple iPhone with assigned telephone number (479) 466-4001.

**ATTACHMENT B-2**
**PARTICULAR THINGS TO BE SEARCHED FOR AND SEIZED**

1.      All records on the Device described in Attachment A-2 that relate to violations of

18 U.S.C. § 1343 and involve Jason Boyd Carney and 2nd Milk, Inc., since January 2016,

including:

        a.      Records including correspondence, memos, letters, text messages, voicemail messages and e-mails relating to 2nd Milk, Kruger Safari Club, LLC, and Wanderlist Global, LLC., (including its employees, donors, sponsors, and board members).

        b.      Records showing receipts and expenditures, the ownership and control of assets or companies, or the availability of substantial amounts of currency, cash, or money obtained in connection with the criminal conduct.

        c.      Financial records including but not limited to, all records relating to money market accounts, savings accounts, checking accounts, retirement accounts, credit card accounts, deposit slips, withdrawal slips, and checks, credit card receipts and credit card statements.

        d.      Photographs or videos depicting assets or the acquisition and disposition of assets.

2.      Evidence of user attribution showing who used or owned the device at the time the

things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved

usernames and passwords, documents, and browsing history;

3.      Records of Internet Protocol addresses used and records of internet activity,

including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

pages, search terms that the user entered into any Internet search engine, and records of user-typed

web addresses.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts. Pursuant to this warrant, DSS may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

### SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

The following procedures will be followed at the time of the search to avoid unnecessary disclosures of privileged information.

4.      These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") and (b) individual(s) not participating in the investigation of the matter, who will be available to assist in the event that a procedure involving potentially privileged information is required (the "Privilege Review Team").

Digital Evidence

5.      The Search Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items to be seized. Digital devices reasonably considered to contain potentially privileged information will be transferred to the Privilege Review Team. Upon receipt of electronic data such as an email account for a filter review, the Privilege Review Team will review the identified digital devices as set forth herein for potentially privileged information.

6.      The Search Team will transport the device(s) to an appropriate law enforcement laboratory or similar facility to be copied at that location, or provide the material directly to the Privilege Review Team.

7.      Privilege Review Team, in consultation with the Search Team, will compile a list of "privilege search terms" to be used to electronically search the digital devices, including specific names and generic words intended to identify potentially privileged information. The Privilege

Review Team will conduct an electronic review of the data on the digital devices using the privilege search terms, and by using search protocols specifically chosen to identify and segregate documents or data containing potentially privileged information. All of the data contained in each digital device capable of containing any of the items to be seized may be reviewed using this procedure. Documents or data that are identified by this review as not potentially privileged, including documents that do not contain the privilege search terms, may be released to the Search Team without court intervention. Notwithstanding the procedures set forth in this paragraph, where a Search Team member otherwise reviews documents not previously determined to contain potentially privileged information, and later determines that such documents may be potentially privileged, the documents will then be provided to a Privilege Review Team member and handled in accordance with the procedures described in this paragraph.

8.      Documents or data identified during the initial privilege search terms review to be potentially privileged will be segregated. A Privilege Review Team attorney may thereafter review the segregated documents to confirm whether or not they contain potentially privileged information. If the Privilege Review Team attorney determines the documents or data are not potentially privileged, they may be given to the Search Team. If at any point the Search Team identified any data or documents that they believe to be potentially privileged, they will cease the review and refer the materials to the Privilege Review Team for further review by the Privilege Review Team. If the Privilege Review Team attorney determines these documents are potentially privileged, the SMU attorney may do any of the following: (a) apply *ex parte* to the court for a determination whether or not the documents contain privileged information; (b) defer seeking court intervention and instead segregate the documents in a manner that makes them inaccessible to the search team; or (c) disclose the documents to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the documents if the parties cannot reach agreement.

9.      In performing the reviews, both the Privilege Review Team and the Search Team may search for and attempt to recover:

a.      deleted, "hidden," or encrypted data;

b.      Records and information indicating the identity and location (both past and present) of the person(s) who use or access the Subject Accounts or who exercise in any way any dominion or control over the accounts, including but not limited to associated email accounts and other internet-based accounts, login Internet Protocol ("IP") addresses, and session times and durations

c.      use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

d.      use forensic examination and searching tools, such as Relativity, Cellebrite, EnCase and FTK (Forensic Tool Kit).

10.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and/or delete or destroy all forensic copies thereof. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

11.     If the search determines that a digital device is (a) itself an item to be seized and/or (b) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized absent further court order or written consent of the property owner.

12.     In order to search for data capable of being read or interpreted by a digital device, and obtain all information authorized to be seized, the Search Team is authorized to seize the following items:

e.     Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

f.     Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

g.     Any magnetic, electronic, or optical storage device capable of storing digital data;

h.     Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

i.     Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

j.     Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

k.     Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.